ORIGINAL  SEALED

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

2022 SEP 20  PM 3: 52

MS

| UNITED STATES OF AMERICA | CRIMINAL NO. |
|---|---|
| v. | 3-22CR0352-K |
| TIMOTHY LYNCH BARTON (1) | |

## INDICTMENT

The Grand Jury charges:

At all times material to this Indictment:

### GENERAL ALLEGATIONS

#### Introduction

1. JMJ Development LLC, and JMJ Holdings, LLC, ("JMJ") were headquartered at 1755 Wittington Place, #340, Dallas, Texas 75234.

2. JMJ was a real estate development firm of single-family homes and other real estate projects. JMJ through its online website held itself out as having a team of professionals with "more than a century of experience working in a broad sector of real estate markets both domestically and globally." The JMJ website further stated, "Over the past 28 years, the principals have developed over 12 million square feet of real estate projects, with a particular emphasis on the major metropolitan submarkets within the region."

3. Carnegie Development LLC and/or Carnegie Development Inc. (Carnegie Development) was a company also located at 1755 Wittington Place, #340, Dallas, Texas

75234. Carnegie Development, through its online website, held itself out as an "innovative Real Estate Investment company providing strategic growth to our shareholders, and support for our stakeholders through high-level leadership and collaboration with partners world wide [sic]." The Carnegie Development website further stated, "We acquire high quality assets on a value basis and drive investment performance through dynamic and innovative operations. With a track record of developing and acquiring real estate in the best performing U.S. markets, we're able to deliver risk-adjusted returns to shareholders."

4. **Timothy Barton** was a resident of Dallas, Texas, and was president and director of JMJ. **Barton** was also the Chairman and CEO of Carnegie Development.

5. Starting in or around May 2017, **Barton** began to travel to Hangzhou, China to market real estate investment opportunities in the United States to Chinese investors.

6. **Barton** and others marketed these investments as separate LLC companies for each project titled as the following ("Wall Properties"): WALL007, LLC ("WALL007"); WALL009, LLC ("WALL009"); WALL010, LLC ("WALL010"); WALL011, LLC ("WALL011"); WALL012, LLC ("WALL012"); WALL016, LLC ("WALL016"); WALL017, LLC ("WALL017"); WALL018, LLC ("WALL 018"); and WALL019, LLC ("WALL019"). Each Wall property was its own investment, and location and specific numbers were avoided that were deemed unlucky in Chinese culture to create the investment name.

## Loan Agreement

7.      **Barton**, through Carnegie Development, entered into Loan Agreements with Chinese investors concerning the Wall properties. Each Loan Agreement stated: (1) the price of the land for the specific property; (2) interest payments between 8 to 20% would be paid to the investor in the first and second years; (3) the initial investment would be paid back to the investor at the end of the loan; (4) 80% of the funds would be provided by the investors, with the other 20% to be provided, in part, by **Barton**; (5) the "Borrower" would pay any agency fees for services; (6) and the "Borrower" was **Barton**, as President of Carnegie Development, LLC.

## Presentations in China

8.      Between in or around May 2017 to in or around May 2019, **Barton** and others made presentations to investors in China. These presentations included a PowerPoint presentation that detailed the specific property that had been purchased and the general details found in the loan agreement. The presentations included slides showing **Barton's** ties to politicians in the United States government. The presentations also represented that the land being purchased was in sought after areas of the Dallas Fort-Worth metroplex with "top rated" public schools.

9.      S.W. was presented as the primary builder for the Wall properties. Investors were told that S.W. would be purchasing the land from the Wall properties to build on. Investors were further told that S.W. would benefit by gaining access to the Wall properties' land to then, in turn, sell to home buyers.

10. Investors during the presentations were told that the investment for each Wall property would cover at least 80% of the investment, and that they would be paid annual interest between 8 to 20% for two years and then receive their initial investment payment back at the end of the second year. The presentations also detailed that **Barton** and S.W. would be contributing a portion of the investment per Wall property and that there would no commissions fees paid out from investor funds.

11. Chinese investors were told that each Wall property would combine multiple Chinese investor investments to total the investor contribution per Wall property. Each Wall property investment contract constituted a security under Section 2(a)(1) of the Securities Act of 1933.

## Misrepresentations and Omissions of Material Fact

12. Concerning Wall007, **Barton** and others represented to investors that the price of the land was $3,450,000 when, in fact, the Wall007 land was purchased for approximately $1,583,687. Wall007 investor funds totaling at least $385,433 were misappropriated and used to pay commissions and for an unrelated investment project. Additionally, **Barton** convinced investors that the Wall007 project was successful by paying out first year interest payments from the Wall007 bank account, when in reality, the funds from the sale of an unrelated non-Wall007 project were wired into the Wall007 bank account to dupe investors.

13. Concerning Wall009, **Barton** and others represented to investors that the price of the land was $2,900,000 when, in fact, the Wall009 land was purchased for approximately $1,100,000. Wall009 investor funds totaling at least $425,000 also were

misappropriated and used for an unrelated investment project. Additionally, **Barton**, convinced investors that the Wall009 project was successful by paying out first year interest payments from the Wall009 bank account, when in reality, investor funds from the Wall012 project were wired into the Wall009 bank account to dupe investors.

14. Concerning Wall010, **Barton** and others represented to investors that the price of the land was $4,400,000 when, in fact, the Wall010 land was under contract for much less and was ultimately never purchased. Additionally, **Barton** convinced investors that the Wall010 project was successful by paying out first year interest payments from the Wall010 bank account, when in reality, the funds came from a non-Wall010 project, which were wired into the Wall010 bank account to dupe investors. Wall010 investor funds totaling at least $136,461 were misappropriated and used for commissions.

15. Concerning Wall011, **Barton** and others represented to investors that the price of the land was $2,950,000 when, in fact, the Wall011 land was purchased for approximately $1,570,000. Wall011 investor funds totaling at least $1,292,113 were misappropriated and used for unrelated projects and commissions. Additionally, **Barton** convinced investors that the Wall011 project was successful by paying out first year interest payments from the Wall011 bank account when, in reality, investor funds from the Wall017 project were wired into the Wall011 bank account to dupe investors.

16. Concerning Wall012, **Barton** and others represented to investors that the price of the land was $5,250,000 when, in fact, the Wall012 land was under contract for much less and ultimately never purchased. Wall012 investor funds totaling $300,000

were misappropriated and used to provide a loan to the contracted seller of the land associated with Wall010.

17. Concerning Wall016, **Barton** and others represented to investors that the price of the land was $4,850,000 when in fact, the Wall016 land was never purchased. Wall016 investor funds totaling approximately $220,000 were misappropriated and used to pay for an investment unrelated to the Wall016 project. Additional investor funds were misappropriated out of the Wall016 account and used to partially fund a $300,000 payment to Aero-Space Reports and a $200,000 payment to Goldmark Hospitality, two expenditures unrelated to the Wall016 project.

18. Concerning Wall017, **Barton** and others represented to investors that the price of the land was $11,000,000 when in fact, the Wall017 land was never purchased. Wall017 investor funds totaling approximately $122,586 were used for the Wall007 project. An additional approximately $1,440,000 of Wall017 investor funds were misappropriated and used to purchase land designated as the Wall019 project. Also, $100,000 of Wall017 investor funds were used to pay an American Express bill in the name of Goldmark Hospitality, which included an $18,961.76 charge to an exercise equipment store and a $31,081.64 charge to a furniture store.

19. Concerning Wall018, **Barton** and others represented to investors that the price of the land was $6,250,000 when in fact, the Wall018 land was purchased for approximately $2,121,000. Wall018 investor funds totaling $230,000 were misappropriated and wired to the National Bank of Greece to make a Wall016 interest payment. Wall018 investor funds totaling $150,000 were misappropriated and wired to

the National Bank of Greece to pay a commission fee. Additionally, $400,000 in primarily Wall018 funds were transferred to Carnegie Development for use of the Wall019 project.

20. Concerning Wall019, **Barton** and others represented to investors that the price of the land was $4,189,650 when in fact, the Wall019 land was purchased for approximately $2,000,000.00. Wall019 investor funds totaling $450,000 were sent to Talos Capital Designated Activity Company, a Dublin-based financial services company and unrelated to the Wall019 project. Additionally, $250,000 of Wall019 investor funds were sent to Plumbrook Consulting, a company operated by one of **Barton's** business associates.

21. **Barton** and others represented to investors that **Barton** and S.W. would contribute a percentage of the investment funds for each specific Wall property when, in fact, no such contribution was ever made for any of the Wall properties.

22. **Barton** and others represented to investors that no commissions would be paid from investor funds and that the "Borrower" would pay any agent fees when, in fact, others received commissions from Wall properties, paid from investor funds.

23. The overall fraudulent scheme involved more than $26,000,000 lost by investors.

## Counts One through Seven
## Wire Fraud
## (Violation of 18 U.S.C. §§ 1343 and 2)

24. The Grand Jury realleges and incorporates by reference the allegations contained in paragraphs 1 through 23 of this indictment, as if fully set forth herein.

25. From in or about October 2017 through in or about May 2019, the defendant, **Timothy Barton**, aided and abetted by others known and unknown to the Grand Jury, devised and intended to devise a scheme and artifice to defraud investors and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, as alleged in paragraphs 1 through 23 of this indictment, which are incorporated as if fully set forth herein. For the purpose of executing and attempting the above-described scheme and artifice, **Barton**, in the Northern District of Texas and elsewhere, did knowingly and with intent to defraud cause to be transmitted, by means of wire and radio communication in interstate commerce and foreign commerce, certain writings, signs, signals, pictures, and sounds, namely, each of the following:

| Count | Date (On or About) | Wall Property | Transaction | Approximate Value |
|---|---|---|---|---|
| 1 | 10/19/2017 | Wall010 | Investor G.X. issued a wire transfer from China to a bank account controlled by **Barton** in the Northern District of Texas | $500,000 |
| 2 | 12/14/2017 | Wall011 | Investor S.Y. completed a wire transfer from China to a bank account controlled by **Barton** in the Northern District of Texas. | $49,000 |
| 3 | 06/04/2018 | Wall012 | Investor G.X. completed a wire transfer from China to a bank account controlled by **Barton** in the Northern District of Texas. | $300,000 |
| 4 | 07/21/18 | Wall016 | Investor H.X. requested a wire transfer from Illinois to a bank account controlled by **Barton** in the Northern District of Texas. | $200,000 |
| 5 | 01/21/19 | Wall017 | Investor N.S. requested a wire transfer from China to a bank account controlled by **Barton** in the Northern District of Texas. | $100,000 |
| 6 | 04/30/2019 | Wall018 | Investor H.C. issued a wire transfer from North Carolina to a bank account controlled by **Barton** in the Northern District of Texas. | $150,000 |
| 7 | 05/24/2019 | Wall019 | Investor R.X. issued a wire transfer from China to a bank account controlled by **Barton** in the Northern District of Texas. | $299,000 |

All in violation of 18 U.S.C. § 1343.

## Count Eight
### Conspiracy to Commit Wire Fraud
### (Violation of 18 U.S.C. § 1349)

26. The Grand Jury realleges and incorporates by reference the allegations contained in paragraphs 1 through 23 and Counts One through Seven of this indictment, as if fully set forth herein.

27. From at least in or about January 2017 through at least in or about May 2019, the defendant, **Timothy Barton**, and others both known and unknown to the Grand Jury, in the Northern District of Texas and elsewhere, did willfully and knowingly combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of 18 U.S.C. § 1343.

### Object of the Conspiracy

28. It was a part and object of the conspiracy for potential investors to invest in a specific Wall Property. An investor would sign a loan agreement stating that they were to receive an interest payment for the next two years and that they would receive their initial investment back. The investor was also told that there were no commission fees and that other parties would also be contributing to the specific Wall property. An investor would then be directed to wire their investment to a bank account located in the Northern District of Texas and elsewhere. Unbeknownst to the investor, there was never anyone else contributing to the investment itself and commission fees were being paid out from investor funds. Additionally, unbeknownst to investors, certain Wall Properties were never purchased, and investor funds were misappropriated to other projects.

## Manner and Means

29. In furtherance of the conspiracy and scheme and artifice to defraud, the defendants, and other persons known and unknown to the Grand Jury, committed the following:

30. **Barton** would direct others to reach out to Chinese investor contacts in China and help set up seminars and presentations in China to pitch a specific Wall Property.

31. **Barton** and others helped create and distribute PowerPoint presentations that were presented to Chinese investors about specific Wall Properties. **Barton** and others also used various marketing methods through means and instrumentalities of interstate commerce, including conference calls, emails, exchange of marketing documents, and company websites.

32. **Barton** signed and agreed to each loan agreement signed by an investor for a specific Wall Property.

33. **Barton** and others would have access to JMJ, Carnegie Development, and Wall Property bank accounts, and would move money in and out of said bank accounts to disguise their initial source.

34. **Barton** directed another individual, M.M. to serve as a straw purchaser for the land for the Wall properties. M.M. would purchase the land from funds received from JMJ Development, Carnegie Development, and Wall Property bank accounts for a significantly lower amount then what was represented to Chinese Investors.

In violation of 18 U.S.C. § 1349.

<u>Count Nine</u>
Securities Fraud
(Violation of 15 U.S.C. §§ 78j(b) and 78ff;
17 C.F.R. § 240.10b-5 and 18 U.S.C. § 2)

35.     The Grand Jury realleges and incorporates by reference the allegations contained in paragraphs 1 through 23 and Counts One through Eight of this indictment, as if fully set forth herein.

36.     From at least in or about January 2017 through at least in or about May 2019, the defendant, **Timothy Barton**, and others both known and unknown to the Grand Jury, in the Northern District of Texas and elsewhere, willfully and knowingly, directly and indirectly, by use of the mails and means and instrumentalities of interstate commerce, used and employed one or more manipulative and deceptive devices and contrivances, and aided and abetted others in using and employing one or more manipulative and deceptive devices and contrivances, in violation of Rule 10b-5 of the Rules and Regulations of the U.S. Securities and Exchange Commission, 17 C.F.R. § 240.10b-5, by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material facts and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, in connection with the sale of securities, namely, an investment contract.

In violation of 15 U.S.C. § 78j(b) and 78ff; 17 C.F.R. § 240.10b-5; and 18 U.S.C. § 2.

## Notice of Criminal Forfeiture
(18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c))

Upon conviction for any of the offenses charged in Counts One through Nine, the defendant, **Timothy Barton**, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), any property, real or personal, constituting or derived from proceeds obtained directly or indirectly as a result of the respective offense.

If any of the above-described forfeitable property, as a result of any act or omission of either defendant:

   a.   cannot be located upon the existence of due diligence;

   b.   has been transferred or sold to, or deposited with, a third party;

   c.   has been placed beyond the jurisdiction of the court;

   d.   has been substantially diminished in value; or

   e.   has been commingled with other property which cannot be divided without difficulty.

It is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) to seek forfeiture of any other property of the defendant up to the value of the property listed as subject to forfeiture.

A TRUE BILL

*[signature]*
FOREPERSON

CHAD E. MEACHAM
UNITED STATES ATTORNEY

*[signature]*
RENEE M. HUNTER
Assistant United States Attorney
State Bar No. 24072942
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8792
Facsimile: 214-659-8600
Email: renee.hunter@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

THE UNITED STATES OF AMERICA

v.

TIMOTHY LYNCH BARTON

SEALED INDICTMENT

18 U.S.C. §§ 1343 and 2
Wire Fraud
(Counts 1 through 7)

18 U.S.C. § 1349
Conspiracy to Commit Wire Fraud
(Count 8)

15 U.S.C. §§ 78j(b) and 78ff; 17 C.F.R. § 240.10b-5 and 18 U.S.C. § 2
Securities Fraud
(Count 9)

18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c)
Forfeiture Notice

9 Counts

A true bill rendered

DALLAS   _____   FOREPERSON

Filed in open court this _20_ day of September, 2022.

**Warrant to be Issued**

_____
UNITED STATES MAGISTRATE JUDGE
Criminal Case Pending: